COMMONWEALTH *vs.* GRANVILLE WYNTER.

No. 00-P-613.

Suffolk. December 14, 2001. - June 26, 2002.

Present: RAPOZA, KAPLAN, & BERRY, JJ.

*Practice, Criminal,* Conduct of prosecutor, Cross-examination by prosecutor.

Where the prosecutor cross-examining the defendant at a criminal trial posed a series of evocative and leading questions, none of which had any mooring in evidence in the trial record or a presented good faith basis, and all of which were designed to elicit negative responses, the interrogation was improper, in that the questions implied, without proof, a motive that the Commonwealth's evidence otherwise lacked, and this court therefore reversed the defendant's conviction. [339-344]

INDICTMENTS found and returned in the Superior Court Department on August 14, 1997.

The cases were tried before *Barbara J. Rouse,* J.

*Robert F. Shaw, Jr.,* for the defendant.

*Cathryn A. Neaves,* Assistant District Attorney, for the Commonwealth.

BERRY, J. We reverse the convictions in this case[1] because of prosecutorial misconduct in the method of cross-examination of the defendant. The law previously announced, and disregarded by the prosecution in this case, is clear: it is error for a prosecutor to communicate impressions by innuendo through patterned and leading questions with no demonstrated evidentiary or good faith basis, which are crafted to evoke negative and prejudicial answers leaving nothing more or less than the unsubstantiated innuendo. *Commonwealth* v. *Fordham,* 417 Mass. 10, 20 (1994).

---

[1]The defendant was convicted on indictments for unlawful possession of a firearm, for unlawful possession of ammunition, and for discharging a firearm within 500 feet of a dwelling. He was sentenced to a two and one-half to four year State prison term on the unlawful possession of a firearm conviction and to two years' probation, from and after, on the possession of ammunition conviction. The conviction for discharging a firearm was placed on file.

1. *Background facts.* In the evening of June 17, 1997, there was a shooting at 10 Verrill Street, in the Dorchester section of Boston. A car pulled up, and three women and a man (the shooter) jumped out. The women were heard to say: "[T]hey're there," and the shooter responded, "[W]here, where?" Then the women ran into 10 Verrill Street. The shooter began firing shots at the house next door. After a few volleys, the shooter stopped firing, ran into 10 Verrill Street and up to the second-floor porch where he again opened fire. Kimberly Lopes, who lived in a second-floor apartment at 10 Verrill Street, rushed into the hallway to protect her son who was on his way downstairs from the third floor. In the lighted hallway, Lopes saw the shooter and noted that he was wearing a gray T-shirt, blue jeans, sneakers, and a gold chain. The shooter moved from the porch to the inside hallway, where he continued to fire for a moment or so. Then he ran downstairs to the first-floor apartment where two of the women resided.

Police officers arrived within approximately five minutes of the shooting. Lopes described the shooter (including the T-shirt he was wearing) and told the police that he had run into the first-floor apartment. The officers knocked several times and then forced the apartment door open. The defendant, who was the only person present, was found in a locked front bedroom. He wore no shirt or shoes. The officers brought the defendant to the front door of the apartment and, in a one-on-one showup, Lopes identified the defendant as the man she had just seen shooting a gun.

In a back bedroom, the officers found a gray T-shirt (which Lopes said was the one worn by the shooter), a pair of sneakers, and a .380 Jennings Burgo semiautomatic pistol, which had been stuffed inside a hamper. Shell casings were found lying in front of the building. Ballistics tests later confirmed that the casings were fired from the .380 semiautomatic weapon.

The defense was misidentification. The defendant contested Lopes's ability accurately to identify him as the shooter because her observation time was limited and because she would have been distracted by her fear and efforts to protect her son. The defendant testified and said that he was napping in the apartment when he heard shots. He opened the apartment door for

one Patrick, a boyfriend of one of the women who lived there. Patrick had a gun and ran out the back door. The defendant was afraid to open the door when the officers knocked because he believed it was someone looking to shoot Patrick.

2. *The improper cross-examination.* In cross-examining the defendant, the prosecutor posed a series of evocative and leading questions, none of which had any mooring in evidence in the trial record or a presented good faith basis, and all of which were designed to elicit negative responses. The pattern of the inquiry was that each question of no known evidentiary origin was designed to yield a negative answer from the defendant, leaving the echo of the question hanging in the air. The impropriety was significant in that the suggestive, nonsupported questions provided critical information concerning motive, to wit: the questions were crafted to imply, without proof, that the defendant had fired the shots in retaliation to avenge the robbing and beating earlier that day of the brother of his friend, thereby providing a motive for the shooting which the Commonwealth's evidence otherwise lacked. The power of suggestion was transmitted by the questions thusly:

Q. "Now, do you know Pamela's brother, Leroy Covelle [phonetic spelling]?"

. . .

A. "Yes."

Q. "You also know that prior to 9:40 when the shots were fired at 10 Verrill Street that Leroy Covelle got robbed and his jaw broken by some kids next door? You knew that, didn't you?"

A. "No, sir."

DEFENSE COUNSEL. "Objection."[2]

The COURT. "He may answer."

[2]The Commonwealth rests heavily on a claim of no defense objection. However, we conclude that defense counsel's objection to the line of questioning interposed after the initial question in this particular series — albeit at the margin — preserved the issue for appellate review. *Commonwealth* v. *Choice*, 47 Mass. App. Ct. 907, 908 (1999) ("ritualistic objection" not necessary

Q. "You didn't know that?"

A. "No, sir."

Q. "You didn't know that there was an incident next door involving some kids from Verrill Street, that Leroy Covelle got robbed of a gold chain and his jaw was busted?"

A. "No, sir."

Q. "About seven o'clock that night?"

A. "No, sir."

. . .

Q. "And did you have [a] conversation with Pam Bailey about her brother's condition that night?"

A. "No, sir."

Q. "No? She didn't tell you that they were going to go down to see if Leroy was okay at the hospital after he got beat up?"

A. "No, sir."

Q. "She didn't tell you that?"

A. "No, sir."

Q. "As a matter of fact, you went with them, didn't you, sir?

A. "No, sir."

Q. "You, Murphy, Diana and Pam were down in Mattapan that night, weren't you?"

A. "No, sir."

Q. "Murphy was driving, wasn't she?"

where matter was adequately called to judge's attention and judge ruled adversely). *Commonwealth* v. *Cancel,* 394 Mass. 567, 573 (1985) (general objection to line of questioning sufficient where timely made).

A. "I have no idea who was driving."

Q. "And you were sitting in the front passenger seat, right?"

A. "I have no idea what you're talking about, sir."

Q. "You weren't down there, sir, down by the barber shop, Blue Hill Avenue?"

A. "No sir."

. . .

Q. "Isn't it true you arrived at the residence about nine o'clock at night with your cousin, Diane Foster, her sisters, Murphy Gordon and Pam Bailey? That's what happened, isn't it sir?"

A. "No, sir."

This pattern of questioning was the essence of improper interrogation. "Where an examiner on cross-examination suggests new facts in an effort to impeach a witness, the examiner should be required to represent that he has a reasonable basis for the suggestion, and also to be prepared with proof if the witness does not acquiesce in the suggestion by giving a self-impeaching answer. Without such assurances, the questioning of the witness is improper, for it would amount to allowing the examiner to smear the witness by insinuation, and unfairly to cast on the other side (here the defendant-witness) a burden somehow to fend against it."[3] *Commonwealth* v. *Delrio*, 22 Mass. App. Ct. 712, 721 (1986). See *Commonwealth* v. *Christian*, 430 Mass. 552, 560, 561 (2000). The point of this existing precedent, which preserves fundamental trial rights, is clear and powerful: "A criminal defendant is not denied a fair trial by rigorous cross-examination of witnesses . . . *unless* the examination is shown to have been conducted in bad faith or

---

[3] By their phraseology, the questions display a form making it "extremely unlikely that the prosecutor in this case expected an affirmative answer to his question . . . ." *Commonwealth* v. *Fordham*, 417 Mass. at 21.

without foundation" (emphasis added). *Commonwealth* v. *White,* 367 Mass. 280, 285 (1975). In *White,* the court quoted with approval the ABA Standards Relating to the Prosecution Function § 5.7(d) (Approved Draft 1971), which states, "The attempt to communicate impressions by innuendo through questions which are answered in the negative, for example . . . 'Did you tell Mr. X that . . . ?' when the questioner has no evidence to support the innuendo, is an improper tactic which has often been condemned by the courts." *Commonwealth* v. *White, supra* at 284. See *Commonwealth* v. *Fordham,* 417 Mass. at 20.[4] Federal cases are in accord. See, e.g., *United States* v. *Hall,* 989 F.2d 711, 716-717 (4th Cir. 1993) (it is improper "under the guise of 'artful cross-examination' to tell the jury the substance of inadmissible evidence"); *United States* v. *Sanchez,* 176 F.3d 1214, 1221-1222 (9th Cir. 1999) (reversing conviction because prosecutor cross-examined defendant about inadmissible statements).[5] The improper cross-examination in this case bears these markings.

Following the initial loaded questions, in a tag-along final question — a question it seems was asked to provide false shoring for a nonexistent foundation — the prosecutor obliquely referred to a witness's statement:

> Q. "You are aware that Pamela Bailey gave a statement in this case? You are aware of that?"
>
> A. "Yes."

This too was improper and, at this point, a defense objection was sustained. By this tack, the prosecutor was deliberately insinuating, without an evidentiary foundation, that the questions had a basis in a memorialized statement, the substance of

---

[4] It is misconduct for a lawyer to "[s]tate or allude to any matter . . . that will not be supported by admissible evidence . . . ." *Commonwealth* v. *Demars,* 42 Mass. App. Ct. 788, 794, *S.C.,* 426 Mass. 1008 (1998) (quoting from former S.J.C. Rule 3:07, Canon 7, DR 7-106, as appearing in 382 Mass. 787 [1981]). See *Commonwealth* v. *Johnson,* 431 Mass. 535, 541 n.3 (2000) (quoting from Rule 3.4[e] of the Massachusetts Rules of Professional Conduct, 426 Mass. 1389 [1998], which states: "A lawyer shall not . . . in trial, allude to any matter that . . . will not be supported by admissible evidence . . . ").

[5] Both of these Federal cases are cited with approval in *Commonwealth* v. *Christian,* 430 Mass. at 564.

which had not been adduced in testimonial evidence or disclosed, and as to which there was no assurance on the record of a reasonable basis for the suggestive questions, or that the prosecutor was "prepared with proof." See *Commonwealth* v. *Delrio,* 22 Mass. App. Ct. at 721.

Notwithstanding the obvious flaws in this whole line of questioning in light of the initial objection thereto and the defendant's consistent denials, the trial judge still did not intervene to require that the Commonwealth present evidence substantiating the asserted facts or to provide assurances this supporting evidence would be presented at a later time. "[T]he judge should have curtailed the questioning and should not have permitted the prosecutor to continue to cross-examine the defendant in the face of his consistent denials." *Commonwealth* v. *Christian,* 430 Mass. at 562. Accord *Commonwealth* v. *Howell,* 49 Mass. App. Ct. 42, 49 (2000) ("The judge should have immediately stopped the line of questioning and asked the prosecutor for the basis of his questions").

While cross-examination, "the greatest legal engine ever invented for the discovery of truth," may be intense, searching and targeted, it may not be unfairly conducted.[6] In this case, under the applicable prejudicial error standard for appellate review, see note 2, *supra,* the effects of the prosecutorial misconduct warrant reversal. The primary defense was misidentification built on questioning the singular identification by Lopes, which was primarily based on a time frame measured in seconds in a charged atmosphere where her attention was diverted in protecting her son from random gunfire; criticizing the one-on-one showup identification as unduly suggestive because the defendant was handcuffed and the police told Lopes to "point him out"; emphasizing that the defendant's fingerprints were not on the gun; and arguing that there was no solid connection tying the defendant to the house next door and no reason why the defendant would be shooting at it. While the "capture" of the defendant in the bedroom and the gun and clothing found nearby were quite incriminating, the defense of misidentifica-

---

[6]Wigmore, A Treatise on the System of Evidence in Trials at Common Law § 1367, at 1697 (1904). See generally Wellman, The Art of Cross-Examination (4th ed. 1941).

tion (or put another way, the "defense" that the Commonwealth had not proved identity) did have, it seems, persuasive effect. The jury, in fact, expressed difficulty in reaching a verdict, returning during the second day of deliberations to state that "[w]e strongly disagree about the verdict and do not think that there will be a change of opinions."[7] In the end, the improper cross-examination may have forged a link to identification of the defendant because the questioning provided pivotal reasons why this particular defendant would, in fact, have been the shooter and this, in turn, buttressed the hitherto sole identification evidence provided by Lopes. Thus, we "cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error . . . ." *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983), quoting from *Kotteakos* v. *United States*, 328 U.S. 750, 765 (1946).

*Judgments reversed.*

*Verdicts set aside.*

---

[7]The defendant also claims that his trial lawyer rendered ineffective assistance by not pursuing a hearing on the filed motion to suppress Lopes's identification at the showup as suggestive and by a substandard performance during the conduct of the trial. As to the motion to suppress, this motion, it is presumed, will be reviewed by new trial counsel, and, if deemed to have merit, will be pursued in a suppression hearing.